**SENTRY INSURANCE COMPANY,**
Appellant,

v.

**Lester WINN, Appellee.**

No. 5304.

Court of Civil Appeals of Texas, Waco.

Feb. 7, 1974.

Rehearing Denied Feb. 28, 1974.

738

Stephenson & Henley, Garland F. Henley, Houston, for appellant.

Roger Knight, Jr., Madisonville, for appellee.

## OPINION

JAMES, Justice.

This is a workmen's compensation case. A jury verdict awarded Plaintiff-Appellee total and permanent disability, and judgment was entered by the trial court in accordance therewith, from which Appellant Sentry Insurance Co. appeals. We affirm.

Appellant comes to this court on THREE points of error, the first point asserting that there was no evidence to sustain the jury's findings of total and permanent disability, and that such findings are against the great weight and preponderance of the evidence. We overrule this point.

Appellee Lester Winn was 24 years old with an eleventh grade education at the time he suffered the injuries in question, to wit, on February 21, 1972. He was employed as a laborer by A. C. Schiller of Madisonville, Texas, at the Schiller Locker Plant located in said city. He commenced his employment in September 1971. The Schiller Locker Plant was engaged in the business of slaughtering cattle, and Plaintiff Winn's duties included such tasks as skinning the cattle and spreading out the hides, as well as any general labor work required, all of which required lifting, bending and stooping.

About two weeks before the main injury of February 21, 1972, Plaintiff was in the process of spreading out a cattle hide, to put salt on it; and when he threw the hide down, he testified that he twisted his back and "caught a click in the high part" of his back. He told Mr. Schiller, his employer, about hurting his back; however, his employer expressed no concern about it, and told Plaintiff to go ahead and get the job done. Plaintiff continued to work, but he testified he suffered pain and discomfort.

On February 21, 1972, about two weeks after the above incident, Plaintiff and another employee Bobby Whaley had gone to Mr. Schiller's house to carry some sacks of horse feed there, and to unload the sacks of feed from the truck into Mr. Schiller's barn. Plaintiff testified that when they were unloading the feed, he (Plaintiff) had one end of a sack of feed and Whaley had the other end; and while they were carrying same, Plaintiff stepped into a hole and twisted his back. The pain caused him to "turn the sack a-loose, cause I couldn't hold it no more."

Mr. Schiller came up to the house about thirty minutes after the above incident happened, and Plaintiff told him about hurting his back again. Mr. Schiller was not concerned, and told Plaintiff and Whaley to get the feed to the horse. Plaintiff tried to help Whaley get the feed to the barn, but he was not able to do so because he was "having more and more pain in my back."

Plaintiff told Mr. Schiller that he was going to see a doctor the next morning about his back.

The next morning, Mr. Schiller came out to Plaintiff's house and asked him if he was coming to work. Plaintiff testified that his back was stiff and sore, and that he told Mr. Schiller he was going to see a doctor about it. Schiller had someone in the pickup with him, and while Plaintiff was getting ready to leave to see a doctor, he heard his (Plaintiff's) car starting up. It was Mr. Schiller who was starting Plaintiff's car. Plaintiff owed Mr. Schiller about $300.00 on this car. When Plain-

tiff went over to his car to get his belongings out of it, Mr. Schiller told Plaintiff that if he did not get out of the way that he was going to run over him. Mr. Schiller then took Plaintiff's car off.

Plaintiff went to see Dr. D. P. Heaton that day, and three other times thereafter. More will be said of Dr. Heaton's diagnosis and findings later on. At this point suffice it to say that Dr. Heaton examined him and recommended that he have some X-rays made; that he take physical therapy treatments, and in addition thereto, Dr. Heaton referred him to an orthopedic surgeon at Bryan, Texas. Plaintiff testified that he did not do any of these things Dr. Heaton suggested because he had no money.

Plaintiff was off work for about a month after the occurrence of the injury of February 21, 1972. He said Dr. Heaton had told him not to go back to work, and that Mr. Schiller had told him not to come back to work. However, after a month had passed, Mr. Schiller did ask Plaintiff to come back to work. Plaintiff did return to work, and Mr. Schiller let Plaintiff have his car back.

Plaintiff testified that he has had stiffness, soreness, and pain at all times since he suffered the injury in question, and as of the time of trial, some sixteen months after the injury occurrence he testified: "I have tightness in this lower part of my back, and pain, it's muscle pain like tightness and stiffness and soreness pain."

At the Schiller Locker Plant, Plaintiff was required to do lifting, bending and stooping, to lift animal carcasses, hides and entrails. He worked about three months after having been off work a month after the injury. During this latter period of employment, he testified that he could not do any of this work without pain and discomfort, and some of this work he could not do at all. He testified that when he was stooping or bending over, that he had trouble in straightening up.

Neither Plaintiff's employer nor Appellant Insurance Company ever paid Plaintiff any compensation, nor did they or either of them ever pay or offer to pay any of Plaintiff's doctor bills or medical expenses.

Dr. Heaton wrote the name of a Dr. Coleman of Bryan, Texas, an orthopedic surgeon, on a piece of paper, and gave it to Plaintiff, and told Plaintiff to show it to Mr. Schiller. Plaintiff did show it to Mr. Schiller, who told him (Plaintiff) that he would let Plaintiff know when to go see this doctor, "but he never did" let Plaintiff know.

On or about June 8, 1972, after Plaintiff had been working about three months after being off from the injury, Plaintiff had broken out in a skin rash while washing the blood off the walls with compound soap. Plaintiff told Mr. Schiller he was going to see a doctor that day after lunch concerning the skin rash. Mr. Schiller told him if he went to see a doctor, that he need not report back for work.

Plaintiff did consult a doctor at Temple, Texas, about the skin rash. When Plaintiff returned to his home at Madisonville, he was told that Mr. Schiller was looking for him. Plaintiff called Mr. Schiller, whereupon Mr. Schiller asked where he was. Plaintiff told him he (Plaintiff) was at home. A few minutes later, Mr. Schiller and his son-in-law came out to Plaintiff's house in a pickup truck. Mr. Schiller and his son-in-law called Plaintiff out of the house, and when Plaintiff got on the porch Mr. Schiller walked up beside Plaintiff with a shotgun, cursed Plaintiff, held the shotgun up to Plaintiff's head and told Plaintiff that "you owe me three hundred dollars and I want it by the weekend." Then Mr. Schiller said, "Do you understand me?" Plaintiff told him that he did. Then Mr. Schiller got in Plaintiff's car and took it off.

After this shotgun incident, Plaintiff was again off work about a month, dur-

ing which time he tried to get a job at several places. He was unsuccessful in getting a job, because after examining his back, no doctor would pass him for heavy lifting work. Plaintiff had never done any type or kind of work except heavy labor.

Then, after having been out of work about a month, Plaintiff got a job with the City of Temple, Texas, loading garbage cans and boxes into city garbage trucks. When he applied for this job, he did not tell anyone that he had hurt his back from previous employment, because he was afraid he could not get the job, and he needed the job.

His first work with the City of Temple was as a "ground man" who lifted and emptied the garbage cans and boxes into the garbage truck. He testified that he did this for awhile, but suffered so much pain that he was unable to lift the garbage cans and boxes; whereupon he was given a job driving a truck. He testified that his feet and legs got numb as he did this work, and that he often had pains at night from his work. He used a heating pad and warm water in an effort to reduce the pain. He testified that he could not (as of the time of trial) go out on the labor market and get a job that required heavy lifting, bending or stooping. He had been working for the City of Temple about a year at the time of trial. He had been to a Dr. Bruce at Temple, Texas, two times for his back trouble while working for the City of Temple, and had been off work a week during this time. The City of Temple paid him for this time off and paid the doctor bill.

Dr. D. P. Heaton did not testify in person, but his medical records were in evidence. His entry dated February 22, 1972, the day after the injury in question, includes the following: "Physical examination reveals well developed colored male, obvious back discomfort, and decreased mobility of back, obvious discomfort on rising, could not bend without discomfort, most of tenderness was in lumbosacral area

bilaterally. Tightness and spasm both para-lumbar muscle. No numbness of leg. Pain demonstrated on straight leg raising bilaterally. I feel at this time patient has acute lumbosacral strain and para-lumbar myositis and muscle spasm and he was started on some medication and muscle relaxants and analgesics and warm compresses, decreased activity. He should be followed closely and other medication such as ultra-sound treatment; (further) evaluation will be done if necessary. In my opinion, the condition has a good chance of clearing entirely, and prognosis is good at this time."

On February 24, 1972, the following entry was made: "Patient still quite stiff but moving some better. Tender in lower lumbar and lumbosacral joints. Advised and prescribed physical therapy evaluation and treatment. Also advised patient to get X-rays of back. From the way patient talked, he planned to take this to court. I advised him that I was interested only in getting him a good recovery and to receive physical therapy evaluation and treatment to be followed closely."

On February 29, 1972, the following entry was made: "Still has discomfort of movement and still tender in lumbosacral area. Patient asked if he could be transferred to Scott and White and I told him he could go anywhere he desired. He has not had physical therapy evaluation and treatment as I advised. I advised patient again to get X-rays of back and have physical therapy evaluation and treatment. In this case, I feel patient should be evaluated by orthopedic surgeon. I feel patient is dissatisfied with his employer and wants to take it to court regardless."

Then on May 18, 1972, was the following final entry: "Patient returning today after seeing lawyer who told him to return for evaluation. I have not seen patient since last note and I had assumed that he had gone elsewhere for treatment and evaluation. He stated that he had not. He did not take my advice and get X-rays and

physical therapy evaluation. I do not feel that I can help this man medically because he has not taken my advice and I feel he has been more interested in what he could get out of it from court from the start than actually having his back treated. I did not examine him today and advised him of my feeling as honestly as possible. I did refer him to orthopedic surgery. This man may have a legitimate physical problem but I do not feel that I can help the man significantly under the circumstances."

To sum up Dr. Heaton's testimony, it is evident that he recognizes that Plaintiff may have a substantial disability; however, he became irritated and unhappy with Plaintiff because Plaintiff failed to follow his advice in getting X-rays of his back, physical therapy, and failed to consult the orthopedic surgeon at Bryan, Texas. The doctor was also unhappy because Plaintiff had consulted a lawyer. Apparently, because of this feeling, Dr. Heaton did not even examine Plaintiff on the visit of May 18, 1972. Of course, Plaintiff's stated reason for failure to follow Dr. Heaton's advice was that he had no money to pay for these suggested medical services.

Dr. J. B. Heath did not examine the Plaintiff, but testified for the purpose of interpreting Dr. Heaton's entries in evidence. Dr. Heath testified that he would not pass a man for heavy labor-type employment who manifested the symptoms described by Dr. Heaton in his entries concerning the Plaintiff. Dr. Heath further testified that muscle spasms are hard to fake, and may pass off; and then again, they may recur; and that the people who make their living using their backs are more likely to have recurrences of back trouble than those who do not so use their backs.

Bobby Whaley by his testimony confirmed Plaintiff's testimony regarding Plaintiff's pain and suffering at the time of the injury in question and afterwards, and plaintiff's inability to do his work.

■ The evidence in the record is ample to support the jury's findings of total and permanent disability. In passing upon a "no evidence" point, it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature. Renfro Drug Co. v. Lewis, (1950) 149 Tex. 507, 235 S.W.2d 609. Likewise, such findings of total and permanent disability are not so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate (1951) 150 Tex. 662, 244 S.W.2d 660. We accordingly overrule Appellant's first point.

■ Appellant's third point complains of the trial court's permitting testimony on the part of Plaintiff Lester Winn regarding the "shotgun incident" occasioned by Mr. Schiller and his son-in-law hereinabove described, which incident occurred in June, 1972, some four months after the injury in question. We overrule this point.

One of Defendant-Appellant's contentions throughout the case was that Plaintiff-Appellee Winn did not suffer any substantial injury, as evidenced by his failure to follow Dr. Heaton's advice to get X-rays, physical therapy, and to consult the orthopedic surgeon. Plaintiff's answer to this contention was that he did not follow Dr. Heaton's recommendations because he did not have any money to pay for these services. It bears out the fact that Plaintiff had no money. We think the testimony in question is admissible as bearing on the ultimate issues of total and permanent disability. Also, Defendant-Appellant contended that Plaintiff was not substantially disabled as evidenced by the fact that he worked three additional months for Schiller Locker Plant, after having been off work for a month after the injury. We think the testimony in question is relevant to the issues of total and permanent disability, because it tends to show the Plaintiff was working under the "lash of necessity," and therefore worked even though he

may have been unable to perform the tasks assigned to him.

At any rate, the testimony in question, if erroneously admitted, was not reasonably calculated to cause, and probably did not cause the rendition of an improper verdict and judgment. Such error, if any, then, is harmless error. Rule 434, Texas Rules of Civil Procedure.

We have carefully considered Appellant's second point and overrule same as without merit.

Judgment of the Trial Court is accordingly affirmed.

Affirmed.